1
2
3
4
5
6
7
8                           UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ANDREW B. THOMPSON, III,                    No.  2:14-cv-0032 GEB DAD P

12                  Petitioner,

13         v.

14   RANDY GROUNDS,                              FINDINGS AND RECOMMENDATIONS

15                  Respondent.

16

17         Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction entered against him

19   on January 28, 2009, in the San Joaquin County Superior Court on charges of second degree

20   murder, unlawful possession of a handgun, unlawful possession of ammunition, and active

21   participation in a criminal street gang (street terrorism), with various sentencing enhancements

22   based upon use of a firearm.  He seeks federal habeas relief on the following grounds:  (1) his

23   right to confront witnesses under the Sixth Amendment was violated when the contents of an

24   autopsy report were admitted into evidence at trial through the testimony of a witness who had

25   not prepared the autopsy report; (2) admission of a trial witness' testimony that petitioner

26   repeatedly invoked his right to counsel during police questioning violated the decision of the

27   United States Supreme Court in Doyle v. Ohio, 426 U.S. 610 (1976); (3) his conviction on the

28   street terrorism charge was not supported by sufficient evidence; and (4) his sentence violates

1

1   state sentencing law.  Upon careful consideration of the record and the applicable law, the

2   undersigned will recommend that petitioner's application for habeas corpus relief be denied.

3   **I. Background**

4          In its unpublished memorandum and opinion affirming petitioner's judgment of

5   conviction on appeal, the California Court of Appeal for the Third Appellate District provided the

6   following factual summary:

> A jury found defendant Andrew Bruce Thompson III guilty of
> second degree murder, unlawful possession of a handgun, unlawful
> possession of ammunition, and active participation in a criminal
> street gang (i.e., street terrorism), with various sentencing
> enhancements, all in connection with the shooting death of his
> girlfriend, Erica Orsino.  Sentenced to an aggregate term of 68
> years 8 months to life in prison, defendant appeals, contending:  (1)
> the trial court violated his constitutional right to confront the
> witnesses against him by admitting a medical examiner's testimony
> about an autopsy performed by another examiner; (2) a police
> detective who testified for the prosecution committed <u>Doyle</u>[1] error
> by repeatedly testifying about defendant's request for an attorney;
> (3) the trial court erred when it directed the jury to reconsider
> inconsistent verdicts on two different firearm enhancements on the
> murder charge; (4) there was insufficient evidence to support a
> gang enhancement and the street terrorism charge; and (5) the trial
> court erred in failing to stay the sentence for street terrorism under
> Penal Code[2] section 654.
>
> We conclude the trial court did not violate defendant's
> constitutional rights by admitting testimony about an autopsy by a
> different medical examiner than the one who performed the autopsy
> and did not err in sentencing defendant for street terrorism.  We
> also conclude there was no <u>Doyle</u> error and defendant has not
> shown there was insufficient evidence to support the street
> terrorism charge.  We do find error, however, in the trial court
> asking the jury to "take a second look at the [enhancement] findings
> on [the murder charge]," because the jury had found the firearm
> enhancement allegation under section 12022.53, subdivision (d) not
> true but the allegation under section 12022.5, subdivision (a) true,
> and the court "wasn't sure if that's what they intended."  This was
> error because the trial court had no right or power to direct or
> suggest that the jury reconsider its "not true" finding on the first
> firearm enhancement.
>
> Because of this error, we will reverse the finding on the section
> 12022.53, subdivision (d) enhancement that the jurors returned after

---

[1]   <u>Doyle v. Ohio</u> (1976) 426 U.S. 610 [49 L.Ed.2d 91].

[2]   All further section references are to the Penal Code.

the court told them to "take a second look" and will remand the case for resentencing.

## FACTUAL AND PROCEDURAL BACKGROUND

For our purposes, the underlying facts may be briefly stated. On May 24, 2008, Orsino was shot to death in her bedroom at her mother's house. At the time, defendant (her boyfriend) was the only other person in the room. Defendant is an admitted gang member.

### The Charges

Defendant was first charged in the death of Orsino four days later. Ultimately, an information charged him with murder. The murder charge included an enhancement allegation under subdivision (d) of section 12022.53, alleging defendant intentionally and personally discharged a handgun in the commission of the murder (the gun discharge enhancement). There was also an enhancement allegation under subdivision (a) of section 12022.5, alleging defendant personally used a firearm in the commission of the murder (the gun use enhancement).

The information also charged defendant with being a felon in possession of a handgun, a rifle, and ammunition. Defendant was also charged with street terrorism and that charge included a gun use enhancement allegation. The information also alleged that defendant had a prior serious felony conviction and two prior prison terms. Early on in the trial, defendant admitted the prior conviction and prior prison term allegations.

### Dr. Omalu's Testimony

At trial, Dr. Bennet Omalu, the chief medical examiner for San Joaquin County, testified for the prosecution. After the prosecution established his qualifications, the court determined that Dr. Omalu qualified as an expert in forensic pathology. Dr. Omalu then testified that "part of [his] job as chief medical examiner is to review autopsies performed by other doctors and then testify independently based on [his] experience at a trial."

Dr. Omalu reviewed the official records of the autopsy of Orsino, including the autopsy photographs, the crime scene photographs, and the clothes Orsino was wearing when she was shot. He also reviewed the autopsy report prepared by Dr. Pakdaman, who performed the autopsy of Orsino. From the report, Dr. Omalu testified to the time of death and about Dr. Pakdaman's examination of Orsino's body and clothing. From autopsy photographs and Orsino's shirt, Dr. Omalu testified about the entrance gunshot wound on Orsino's abdomen and to his opinion that the gun was at least two feet away from Orsino when the shot was fired. From another autopsy photograph showing the exit wound and measurement information that was presumably from the autopsy report, Dr. Omalu testified that the bullet went essentially straight through the body.

With reference to a mannequin (and, again, presumably to information from the autopsy report), Dr. Omalu then testified about the organs the bullet struck, the damage it caused – particularly to the iliac artery – and how that damage caused arterial bleeding that led to Orsino's death.  Further testimony addressed the amount of internal bleeding, the absence of additional injuries, and the likelihood that Orsino was lying on the bed when she was shot. At no time did defendant object to Dr. Omalu testifying because he did not perform the autopsy on Orsino.

**Detective Rodriguez's Testimony**

Stockton Police Detective Eduardo Rodriguez testified that when defendant turned himself in to the police after the police went to his parents' house, defendant had an injury on his upper left arm. Detective Rodriguez further testified that he thought he asked defendant if he wanted medical assistance, but defendant "wouldn't say anything to [him]."

On cross-examination, Detective Rodriguez testified defendant had a wound on his chest as well.  As defense counsel pursued the issue of medical care, the following exchange occurred:

"Q. Now, I think you indicated that you offered some medical care to the defendant, and you indicated he just didn't answer your question about whether or not he wanted medical care, or -

"A. It was kind of unusual, because whatever question we asked him, I believe he said he wanted his lawyer.

"Q. Okay.

"A. If we asked him for water, medical help, 'I want my lawyer.'

"Q. Okay. And that was – you asked him if he wanted to see somebody to get some help for his wounds, and that's the same answer he gave you?

"A. No matter what question we asked him, his response was he wanted his lawyer.

"Q. Here is my question.  Did he ask you to see a lawyer prior to the time that he saw someone to get medical care for his wounds?

"A. Well, a lawyer had brought him in, so I assume they discussed it.

"Q. Well, I know.  I'm not interested in your assumptions.  Please listen to the question.  Did he make that reply, I want to talk to my lawyer, when you asked him about getting medical care?

"A. I don't remember.  I'd have to refer back to the tape for his response.

/////

4

"Q. When you were talking to him about whether he wanted medical care or not, was his lawyer present?

"A. No.

"Q. And just for the record, I was not the lawyer who was with him at the time, is that correct?

"A. Correct."

The trial court later instructed the jury as follows:  "A defendant has an absolute constitutional right not to make statements to the police and request representation by an attorney.  Do not consider, for any reason at all, the fact that the defendant did not give a statement to the police and requested representation by an attorney.  Do not discuss that fact during your deliberations or let it influence your decision in any way."

**The Verdicts**

The jury returned its verdicts on January 27, 2009, but because the foreperson was not well, the trial court did not unseal them until the morning of January 28.  When it did so, the court made the following statement:  "Okay. [Jury foreperson], I'm going to have you folks go back into the jury room.  You have two verdict forms filled out on Count 1 [the murder charge] that are inconsistent, okay, so I need you folks to tell me what you meant, okay?  Put those on top.  And I'm also going to ask you to take a second look at the findings on Count 1.  Okay.  Send us a note when you are ready to come back in."  (Italics added.)

The jury subsequently sent a note indicating "[t]he corrections have been made for the required paperwork."  The jury then returned a verdict of guilty of second degree murder, with true findings on both the gun discharge enhancement and the gun use enhancement on that charge.  The jury found defendant guilty of unlawfully possessing a handgun and ammunition, but not guilty of unlawfully possessing a rifle.  The jury also found defendant guilty of street terrorism and found the gun use enhancement allegation on that charge true.

* * *

**Sentencing**

The trial court sentenced defendant as follows:  On the murder charge, the court imposed a mandatory term of 15 years to life in prison, doubled to 30 years for defendant's prior conviction.  The court imposed a consecutive term of 25 years to life for the gun discharge enhancement and a middle term of four years for the gun use enhancement, but the court stayed the latter term under section 654.

On the remaining charges, the court selected the street terrorism charge as the principal term and imposed the upper term of three

5

1         years, doubled to six for the prior conviction. The court also

2         imposed a consecutive four-year term for the gun use enhancement on the street terrorism charge. The court imposed consecutive

3         terms of eight months (one-third the middle term), doubled to 16 months for the prior conviction, on the charges of unlawfully

4         possessing a handgun and ammunition. The court imposed two one-year sentences for the prior prison terms, but stayed one of

5         those sentences under section 654. The aggregate prison term was 68 years 8 months to life. Defendant timely appealed.

6   People v. Thompson, No. C061568, 2010 WL 4493478, at **1-5 (Cal. Ct. App. Nov. 10, 2010).

7         After the California Court of Appeal affirmed petitioner's judgment of conviction, he filed

8 a petition for review in the California Supreme Court, in which he raised all of the claims

9 contained in the petition now before this court. (Resp't's Lod. Doc. 5.) The California Supreme

10 Court granted the petition for review, but deferred further action pending consideration and

11 disposition of an issue related to petitioner's Confrontation Clause claim in four cases that were

12 then pending before that court. (Resp't's Lod. Doc. 6.) Subsequently, by order dated May 22,

13 2013, the California Supreme Court dismissed review of petitioner's claims in light of its

14 decisions in People v. Lopez, 55 Cal. 4th 569 (2012) (holding that the introduction into evidence

15 of a non-testifying laboratory analyst's report on the percentage of alcohol in a blood sample

16 taken from the defendant, and the testimony of the analyst's colleague relating some of the

17 report's contents, did not violate defendant's right to confrontation); People v. Dungo, 55 Cal.4th

18 608 (2012) (holding that statements in autopsy report describing the condition of murder victim's

19 body were not testimonial; thus testimony of analyst's supervisor about those statements did not

20 violate the Confrontation Clause); and People v. Rutterschmidt, 55 Cal.4th 650 (2012) (holding

21 that any Confrontation Clause violation in admitting toxicology analysis of victim's blood

22 constituted harmless error); and the decision of the United States Supreme Court in Williams v.

23 Illinois, ___ U.S. ___, 132 S. Ct. 2221 (2012) (holding that an expert's testimony about a non-

24 testifying analyst's report referring to DNA profile as having been produced from semen found

25 /////

26 /////

27 /////

28 /////

6

1  on victim did not violate the Confrontation Clause).  (Resp't's Lod. Doc. 7.)[3]

2  Petitioner filed his federal habeas petition in this court on January 6, 2014.  (ECF No. 1.)

3  **II.  Standards of Review Applicable to Habeas Corpus Claims**

4  An application for a writ of habeas corpus by a person in custody under a judgment of a

5  state court can be granted only for violations of the Constitution or laws of the United States.  28

6  U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

7  application of state law.  See Wilson v. Corcoran, 562 U.S.___, ___, 131 S. Ct. 13, 16 (2010);

8  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir.

9  2000).

10  Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

11  corpus relief:

12  An application for a writ of habeas corpus on behalf of a
13  person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the
14  claim -

15  (1) resulted in a decision that was contrary to, or involved
16  an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

17  (2) resulted in a decision that was based on an unreasonable
18  determination of the facts in light of the evidence presented in the State court proceeding.

19  For purposes of applying § 2254(d)(1), "clearly established federal law" consists of

20  holdings of the United States Supreme Court at the time of the last reasoned state court decision.

21  Greene v. Fisher, ___ U.S. ___, 132 S. Ct. 38, 44 (2011); Stanley v. Cullen, 633 F.3d 852, 859

22  (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).  Circuit court precedent

23  "may be persuasive in determining what law is clearly established and whether a state court

24  applied that law unreasonably."  Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561,

25  567 (9th Cir. 2010)).  However, circuit precedent may not be "used to refine or sharpen a general

26  principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has

27  ───────────────

[3]  Justice Corrigan would have retained the matter for decision by the California Supreme Court.
28  Id.

7

1    not announced." Marshall v. Rodgers, ___ U.S. ___, ___, 133 S. Ct. 1446, 1450 (2013) (citing

2    Parker v. Matthews, ___ U.S. ___, ___, 132 S. Ct. 2148, 2155 (2012)). Nor may it be used to

3    "determine whether a particular rule of law is so widely accepted among the Federal Circuits that

4    it would, if presented to th[e] [Supreme] Court, be accepted as correct. Id. Further, where courts

5    of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly

6    established Federal law" governing that issue. Carey v. Musladin, 549 U.S. 70, 77 (2006).

7         A state court decision is "contrary to" clearly established federal law if it applies a rule

8    contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

9    precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003).

10   Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the

11   writ if the state court identifies the correct governing legal principle from the Supreme Court's

12   decisions, but unreasonably applies that principle to the facts of the prisoner's case.[4] Lockyer v.

13   Andrade, 538 U.S. 63, 75 (2003); Williams, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002

14   (9th Cir. 2004). A federal habeas court "may not issue the writ simply because that court

15   concludes in its independent judgment that the relevant state-court decision applied clearly

16   established federal law erroneously or incorrectly. Rather, that application must also be

17   unreasonable." Williams, 529 U.S. at 412. See also Schriro v. Landrigan, 550 U.S. 465, 473

18   (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent

19   review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

20   "A state court's determination that a claim lacks merit precludes federal habeas relief so long as

21   'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v.

22   Richter, 562 U.S. 86,___,131 S. Ct. 770, 786 (2011) (quoting Yarborough v. Alvarado, 541 U.S.

23   652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal

24   court, a state prisoner must show that the state court's ruling on the claim being presented in

25   federal court was so lacking in justification that there was an error well understood and

26   _____

27   [4]  Under § 2254(d)(2), a state court decision based on a factual determination is not to be
     overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
     presented in the state court proceeding." Stanley, 633 F.3d at 859 (quoting Davis v. Woodford,
28   384 F.3d 628, 638 (9th Cir. 2004)).

1  comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 131

2  S. Ct. at 786-87.

3      If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

4  court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v. Woodford,

5  527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008)

6  (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of §

7  2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering

8  de novo the constitutional issues raised.").

9      The court looks to the last reasoned state court decision as the basis for the state court

10  judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

11  If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

12  previous state court decision, this court may consider both decisions to ascertain the reasoning of

13  the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a

14  federal claim has been presented to a state court and the state court has denied relief, it may be

15  presumed that the state court adjudicated the claim on the merits in the absence of any indication

16  or state-law procedural principles to the contrary." Richter, 131 S. Ct. at 784-85. This

17  presumption may be overcome by a showing "there is reason to think some other explanation for

18  the state court's decision is more likely." Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797,

19  803 (1991)). Similarly, when a state court decision on a petitioner's claims rejects some claims

20  but does not expressly address a federal claim, a federal habeas court must presume, subject to

21  rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, ___ U.S. ___,

22  ___, 133 S. Ct. 1088, 1091 (2013).

23      Where the state court reaches a decision on the merits but provides no reasoning to

24  support its conclusion, a federal habeas court independently reviews the record to determine

25  whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v.

26  Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is not de novo

27  review of the constitutional issue, but rather, the only method by which we can determine whether

28  a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. Where no

1   reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

2   reasonable basis for the state court to deny relief." <u>Richter</u>, 131 S. Ct. at 784.

3        A summary denial is presumed to be a denial on the merits of the petitioner's claims.

4   <u>Stancle v. Clay</u>, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012). While the federal court cannot analyze

5   just what the state court did when it issued a summary denial, the federal court must review the

6   state court record to determine whether there was any "reasonable basis for the state court to deny

7   relief." <u>Richter</u>, 131 S. Ct. at 784. This court "must determine what arguments or theories . . .

8   could have supported, the state court's decision; and then it must ask whether it is possible

9   fairminded jurists could disagree that those arguments or theories are inconsistent with the

10   holding in a prior decision of [the Supreme] Court." <u>Id.</u> at 786. The petitioner bears "the burden

11   to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" <u>Walker v.</u>

12   <u>Martel</u>, 709 F.3d 925, 939 (9th Cir. 2013) (quoting <u>Richter</u>, 131 S. Ct. at 784).

13        When it is clear, however, that a state court has not reached the merits of a petitioner's

14   claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

15   habeas court must review the claim de novo. <u>Stanley</u>, 633 F.3d at 860; <u>Reynoso v. Giurbino</u>, 462

16   F.3d 1099, 1109 (9th Cir. 2006); <u>Nulph v. Cook</u>, 333 F.3d 1052, 1056 (9th Cir. 2003).

17   **III. Petitioner's Claims**

18       **A. Confrontation Clause**

19        In petitioner's first ground for relief, he claims that his "Sixth Amendment right to

20   confrontation and his Fifth and Fourteenth Amendment right to due process were violated by Dr.

21   Omalu's testimony to the autopsy based upon the report and conclusions of non-testifying

22   autopsy pathologist Dr. Pakdaman." (ECF No. 1 at 5.)[5] Petitioner notes that Dr. Omalu "did not

23   conduct the autopsy and did not personally observe the body." (<u>Id.</u>) He also observes that the

24   prosecutor did not establish that Dr. Pakdaman was unavailable to testify, nor did he otherwise

25   explain why he elected to call Dr. Omalu and not Dr. Pakdaman as a witness to testify about the

26   autopsy results. (<u>Id.</u>) Petitioner argues that Dr. Omalu "served as a conduit for testimonial

27

28   [5]  Page number citations such as this one are to the page numbers reflected on the court's CM/ECF system and not to page numbers assigned by the parties.

10

1    hearsay and was not rendering an independent expert opinion at trial."  (Id.)  Petitioner concludes

2    that "the denial of the opportunity to cross-examine and confront autopsy pathologist Dr.

3    Pakdaman regarding his autopsy observations and conclusions violated the Confrontation Clause

4    of the Sixth Amendment as applied to the states via the Fourteenth Amendment."  (Id.)

5               **1.  State Court Decision**

6         The California Court of Appeal for the Third Appellate District rejected these arguments,

7    reasoning as follows:

> **The Medical Examiner's Testimony Did Not Violate Defendant's Constitutional Right To Confront The Witnesses Against Him**
>
> On appeal, defendant asserts for the first time that "Dr. Omalu's testimony on the basis of non-testifying autopsy pathologist Dr. Pakdaman's report, findings, and conclusions violated the Sixth Amendment Confrontation Clause."  We disagree.
>
> As an initial matter, the People contend defendant forfeited this claim of error by failing to raise it in the trial court.  "It is, of course, 'the general rule that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal.'"  (People v. Benson (1990) 52 Cal.3d 754, 786, fn. 7, quoting People v. Rogers (1978) 21 Cal.3d 542, 548.)
>
> Defendant contends the rule of forfeiture (or waiver) does not apply because an objection to Dr. Omalu's testimony on confrontation clause grounds would have been futile.  According to defendant, Dr. Omalu's testimony was admissible under a California Supreme Court decision in effect when Dr. Omalu testified – People v. Geier (2007) 41 Cal.4th 555 – and thus an objection would have been futile, but a subsequent United States Supreme Court decision – Melendez-Diaz v. Massachusetts (2009) 557 U.S. ---- [174 L.Ed.2d 314] – now "directly contradicts the California Supreme Court's interpretation of the federal [C]onstitution's Sixth Amendment Confrontation Clause."
>
> The futility cases defendant cites do not address evidentiary objections, which, by statute, must be made in the trial court or forfeited.  (See Evid.Code, § 353 ["A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion"].)  Moreover, as the People point out, while the trial court may have been bound by Geier, an objection in the trial court still would have "preserve[d] [the issue] for ultimate federal review."

11

Even if we can review defendant's confrontation clause argument despite his failure to raise it in the trial court, for the following reasons we find no merit in it.

In <u>Crawford v. Washington</u> (2004) 541 U.S. 36 [158 L.Ed.2d 177], the United States Supreme Court held that under the Sixth Amendment, which guarantees a criminal defendant "'the right . . . to be confronted with the witnesses against him,'" an out-of-court statement that is "testimonial" in nature cannot be admitted into evidence over the defendant's objection unless the person who made the statement is unavailable to testify at trial and the defendant had a prior opportunity for cross-examination. (541 U .S. at pp. 42, 68-69 [158 L.Ed.2d at pp. 187, 203].)  The court declined "to spell out a comprehensive definition of 'testimonial,'" but stated that "it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." (<u>Id.</u> at p. 68 [158 L.Ed.2d at p. 203].)

In <u>Davis v. Washington</u> (2006) 547 U.S. 813 [165 L.Ed.2d 224], which also included a second case, <u>Hammon v. Indiana</u>, the court qualified the latter part of Crawford, holding that "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (<u>Id.</u> at p. 822 [165 L.Ed.2d at p. 237].)  Based on this holding, the court concluded the statement at issue in <u>Davis</u> was not testimonial, but the statements at issue in <u>Hammon</u> were.  (<u>Davis</u>, at pp. 828-832 [165 L.Ed.2d at pp. 240-243].)

Justice Thomas concurred in the judgment in part and dissented in part, agreeing with the conclusion about the statement in <u>Davis</u> but disagreeing about the statement in <u>Hammon</u>.  (<u>Davis v. Washington, supra</u>, 547 U.S. at pp. 834, 842 [165 L.Ed.2d at pp. 244-245, 249].)  According to Justice Thomas, the standard the court adopted was "neither workable nor a targeted attempt to reach the abuses forbidden by the [Confrontation] Clause." (<u>Id.</u> at p. 842 [165 L.Ed.2d at p. 249].)  Drawing on his own concurrence in <u>White v. Illinois</u> (1992) 502 U.S. 346, 365 [116 L.Ed.2d 848, 865], Justice Thomas stated that "the plain terms of the 'testimony' definition [the court adopted in <u>Crawford</u> ] necessarily require some degree of solemnity before a statement can be deemed 'testimonial,'" and "[t]his requirement of solemnity supports [his] view that the statements regulated by the Confrontation Clause must include 'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.'" (<u>Davis v. Washington, supra</u>, 547 U.S. at p. 836 [165 L.Ed.2d at p. 246].)

In 2009, in <u>Melendez-Diaz</u>, the court faced the question of whether "affidavits reporting the results of forensic analysis which showed that material seized by the police and connected to the defendant

was cocaine . . . are 'testimonial,' rendering the affiants 'witnesses' subject to the defendant's right of confrontation under the Sixth Amendment." (Melendez-Diaz v. Massachusetts, supra, 557 U.S. at p. ---- [174 L.Ed.2d at p. 319].) Led by Justice Scalia, four members of the court concluded "[t]here is little doubt that the documents at issue in this case fall within the 'core class of testimonial statements.'" (Id. at p. ---- [174 L.Ed.2d at p. 321].) Another four members disagreed, concluding "[l]aboratory analysts who conduct routine scientific tests are not the kind of conventional witnesses to whom the Confrontation Clause refers." (Id. at p. ---- [174 L.Ed.2d at p. 350], dis. opn. of Kennedy, J.) Justice Thomas concurred with Justice Scalia's opinion, but wrote "separately to note that [he] continue[s] to adhere to [his] position that 'the Confrontation Clause is implicated by extrajudicial statements only insofar as they are contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.'" (Id. at p. ---- [174 L.Ed.2d at p. 333].) He explained that he "join[ed] the Court's opinion in this case because the documents at issue in this case 'are quite plainly affidavits,'" and "[a]s such, they 'fall within the core class of testimonial statements' governed by the Confrontation Clause."[6] (Ibid.)

With this understanding of the current state of the law in mind, we turn to defendant's arguments. He contends that under Melendez-Diaz, "when the States seeks [sic] to introduce forensic analysis in the form of testimony regarding an autopsy report, absent a showing that the analyst is unavailable to testify at trial and that the defendant had a prior opportunity to cross-examine the analyst, such evidence is inadmissible." We disagree.

In addressing this issue, it is important to emphasize that Crawford and Melendez-Diaz address the issue of when an out-of-court statement that is "testimonial" in nature can be admitted into evidence. Thus, the first step in any analysis under those cases is to determine exactly what out-of-court statement was admitted into evidence. Defendant skips that step here. While he asserts "the admission of Dr. Omalu's testimony conveying testimonial hearsay of non-testifying autopsy pathologist Dr. Pakdaman violated the Sixth Amendment Confrontation Clause," he never identifies exactly what part or parts of Dr. Omalu's testimony he contends "convey[ed] testimonial hearsay of . . . Dr. Pakdaman ." For the sake of argument, however, we will assume that defendant's confrontation clause objection applies to every instance in which

/////

/////

---

[6]  The California Supreme Court has granted review in several cases discussing the scope of Melendez-Diaz. (People v. Rutterschmidt (2009) 176 Cal.App.4th 1047, review granted Dec. 2, 2009, S176213; People v. Dungo (2009) 176 Cal.App.4th 1388, review granted Dec. 2, 2009, S176886; People v. Lopez (2009) 177 Cal.App.4th 202, review granted Dec. 2, 2009, S177046; People v. Gutierrez (2009) 177 Cal.App.4th 654, review granted Dec. 2, 2009, S176620.)

13

Dr. Omalu testified to statements of Dr. Pakdaman contained in the autopsy report.[7]

Referencing a footnote in Justice Scalia's opinion (<u>Melendez-Diaz v. Massachusetts, supra</u>, 557 U.S. at p. ----, fn. 5 [174 L.Ed.2d at p. 326, fn. 5] ), defendant asserts that "the United States Supreme Court in <u>Melendez-Diaz</u> specifically referenced autopsy examinations as one kind of forensic analysis that constitutes a testimonial statement to which the forensic analyst is a witness and to which the Confrontation Clause applies." Even assuming this to be true, however, in understanding the Supreme Court's holding in <u>Melendez-Diaz</u> it is necessary to distinguish between the conclusions and observations in Justice Scalia's opinion and the conclusions and observations in Justice Thomas's opinion, because "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'" (<u>Marks v. United States</u> (1977) 430 U.S. 188, 193 [51 L.Ed.2d 260, 266].)

As we have explained, in his opinion, Justice Scalia concluded "that the documents at issue in this case fall within the 'core class of testimonial statements.'" (<u>Melendez-Diaz v. Massachusetts, supra</u>, 557 U.S. at p. ---- [174 L.Ed.2d at p. 321].) The "documents at issue" were not simply forensic laboratory reports, however, but "'certificates of analysis'" that "were sworn to before a notary public." (<u>Id.</u> at p. ---- [174 L.Ed.2d at p. 320].) This was significant to Justice Scalia's analysis because although the documents were "denominated by Massachusetts law 'certificates,' [they we]re quite plainly affidavits: 'declaration[s] of facts written down and sworn to by the declarant before an officer authorized to administer oaths,'" and thus were "functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination.'" (<u>Id.</u> at p. ---- [174 L.Ed.2d at p. 321].) This fact was also significant to Justice Thomas, who concurred in Justice Scalia's opinion only because the "certificates" were "'quite plainly affidavits,'" and "[a]s such, they 'fall within the core class of testimonial statements' governed by the Confrontation Clause." (<u>Id.</u> at p. ---- [174 L.Ed.2d at p. 333].)

Whatever broader ideas about what constitutes a "testimonial" statement may be drawn from Justice Scalia's opinion in <u>Melendez-Diaz</u>, under <u>Marks</u> the holding of the court in <u>Melendez-Diaz</u> can be found in Justice Thomas's conclusion that "'the Confrontation Clause is implicated by extrajudicial statements only insofar as they are contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.'" (<u>Melendez-Diaz v. Massachusetts, supra</u>, 557 U.S. at p. ---- [174 L.Ed.2d at p. 333].)

---

[7]  For example, Dr. Omalu testified that "in the autopsy report [Dr. Pakdaman] documented he examined some articles of clothing" and "described an article of clothing that exhibited evidence of gunshot wounds on the body."

1
2
3
4
5
6
7
8
9
10

> Based on this understanding of <u>Melendez-Diaz</u>, the trial court did not err in admitting Dr. Omalu's testimony regarding statements made by Dr. Pakdaman in his autopsy report because the autopsy report was not formalized testimonial material, like an affidavit, deposition, prior testimony, or confession.   Under Government Code section 27491.4, subdivision (a) "[t]he detailed medical findings resulting from an inspection of the body or autopsy by an examining physician shall be either reduced to writing or permanently preserved on recording discs or other similar recording media, shall include all positive and negative findings pertinent to establishing the cause of death in accordance with medicolegal practice and this, along with the written opinions and conclusions of the examining physician, shall be included in the coroner's record of the death."   Thus, the autopsy report is clearly a government record, but that does not make it "formalized testimonial material," as Justice Thomas employs that term.   Accordingly, the statements contained in the autopsy report here were not "testimonial" for purposes of the confrontation clause, and the admission of Dr. Omalu's testimony about those statements did not violate defendant's rights under the Sixth Amendment.

11
12

<u>Thompson</u>, 2010 WL 4493478, at *5-8.

13

**2.  Applicable Law**

14

The Sixth Amendment to the United States Constitution grants a criminal defendant the

15

right "to be confronted with the witnesses against him."  U.S. Const. amend. VI.  "The 'main and

16

essential purpose of confrontation is to secure for the opponent the opportunity of cross-

17

examination.'"  <u>Fenenbock v. Director of Corrections for California</u>, 692 F.3d 910, 919 (9th Cir.

18

2012) (quoting <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 678 (1986)).  The Confrontation Clause

19

applies to the states through the Fourteenth Amendment.  <u>Pointer v. Texas</u>, 380 U.S. 400, 406

20

(1965).

21

As recognized by the California Court of Appeal in its opinion affirming petitioner's

22

judgment of conviction, in 2004 the United States Supreme Court held that "a defendant's

23

Confrontation Clause rights are violated by the admission of 'testimonial statements of a witness

24

who did not appear at trial unless he was unavailable to testify, and the defendant had . . . a prior

25

opportunity for cross-examination.'"  <u>United States v. Vera</u>, 770 F.3d 1232, 1237 (9th Cir. 2014)

26

(quoting <u>Crawford v. Washington</u>, 541 U.S. 36, 53-54 (2004)).  The <u>Crawford</u> rule applies only to

27

hearsay statements that are "testimonial" in nature and does not bar the admission of non-

28

testimonial hearsay statements.  <u>Crawford</u>, 541 U.S at 42, 51, 68.  <u>See also</u> <u>Whorton v. Bockting</u>,

15

1    549 U.S. 406, 420 (2007) ("the Confrontation Clause has no application to" an "out-of-court

2    nontestimonial statement.")  "Nevertheless, an expert witness may offer opinions based on such

3    inadmissible testimonial hearsay, as well as any other form of inadmissible evidence, if 'experts

4    in the particular field would reasonably rely on those kinds of facts or data in forming an opinion

5    on the subject.'" Vera, 770 F.3d at 1237 (quoting Fed. R. Evid. 703). See also Lopez v. Horel,

6    Civ. No. 07-4169, 2011 WL 940054, at *11 (C.D. Cal. Jan. 19, 2011) ("Thus, Crawford does not

7    undermine the established rule that experts can testify to their opinions on relevant matters and

8    may relate the information and sources upon which they rely in forming those opinions.") (citing

9    Ortiz v. Tilton, Civ. No. 06-1752, 2008 WL 2543440, at *14, 16 (S.D. Cal. May 5, 2008), report

10   and recommendation adopted by, 2009 WL 1796537 (S.D. Cal. Jun. 23, 2009)).

11        Although the Supreme Court in Crawford declined to provide a comprehensive definition

12   of the term "testimonial," it did state that "[s]tatements taken by police officers in the course of

13   interrogations are . . . testimonial under even a narrow standard." Crawford, 541 U.S. at 52.  The

14   court also provided the following "formulations" of a "core class" of testimonial statements:  (1)

15   "ex parte in-court testimony or its functional equivalent – that is, material such as affidavits,

16   custodial examinations, prior testimony that the defendant was unable to cross-examine, or

17   similar pretrial statements that declarants would reasonably expect to be used prosecutorially;"

18   (2) "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits,

19   depositions, prior testimony, or confessions;" and (3) "statements that were made under

20   circumstances which would lead an objective witness reasonably to believe that the statement

21   would be available for use at a later trial." Id. at 51-52.

22        More than five years after Crawford was decided, in Melendez-Diaz v. Massachusetts,

23   557 U.S. 305 (2009), the Supreme Court held that "a forensic laboratory report ranked as

24   testimonial for purposes of the Confrontation Clause." Flourney v. Small, 681 F.3d 1000, 1005

25   (9th Cir. 2012), cert. denied, ___U.S.___, 133 S. Ct. 880 (2013).  Specifically, the Supreme Court

26   in Melendez-Diaz extended the reasoning in Crawford to sworn "certificates of analysis" which

27   confirmed that the substance seized from the defendant was cocaine.  The Supreme Court held

28   that a sworn certificate of analysis was "testimonial" and could not be admitted into evidence

1   absent the testimony of the person who performed the tests.  Melendez-Diaz, 557 U.S. at 318.

2   The Supreme Court rejected the argument that such certificates were business records and

3   therefore admissible pursuant to the business records exception to the hearsay rule.  Id. at 321.

4   **3. Analysis**

5          Before addressing petitioner's claim under the Confrontation Clause, this court must

6   determine in this particular case what constitutes "clearly established Federal law, as determined

7   by the Supreme Court of the United States," for purposes of AEDPA review.  See Lockyer, 538

8   U.S. at 71; 28 U.S.C. § 2254(d).  "Clearly established Federal law" includes only Supreme Court

9   decisions as of the time the state court renders its decision on the merits of petitioner's claims, not

10  those decisions as of the time the petitioner's conviction becomes final.  Greene, 132 S. Ct. at 44;

11  see also Meras v. Sisto, 676 F.3d 1184, 1187 (9th Cir. 2012).  Here, the last state court

12  adjudication on the merits of petitioner's Confrontation Clause claim was the November 20, 2010

13  opinion of the California Court of Appeal.

14         Accordingly, that opinion is the operative decision for this federal habeas court's review

15  of petitioner's Confrontation Clause claim under AEDPA.  The California Supreme Court's later

16  decisions, which resulted in an order dismissing review of petitioner's claims, was not an

17  adjudication on the merits of those claims and therefore does not constitute the relevant decision

18  or date of decision to which the "clearly established Federal law" criterion must be applied.  See

19  Greene, 132 S. Ct. at *44-45 (noting that a decision by a state supreme court not to hear an appeal

20  of petitioner's claims – "that is, not to decide at all" – does not constitute the relevant "decision"

21  for purposes of § 2254(d)); Meras, 676 F.3d at 1187 (Melendez–Diaz did not constitute clearly

22  established federal law where it was decided after last state court adjudication on merits);

23  Flournoy, 681 F.3d at 1004–05 (same),  In light of this, the subsequent decisions of the United

24  States Supreme Court in Bullcoming v. New Mexico, ___ U.S. ___, ___, 131 S. Ct. 2705, 2707

25  (2011) and Williams v. Illinois, 567 U.S. ___, ___, 132 S. Ct. 2221, 2228 (2012), issued after the

26  California Court of Appeal's November 10, 2010 decision in petitioner's case, have no bearing on

27  this court's analysis of whether petitioner is entitled to federal habeas relief with respect to his

28  /////

1    Confrontation Clause claim.[8]  Id.  Instead, the question before this court is whether the November

2    20, 2010 decision of the California Court of Appeal with respect to petitioner's Confrontation

3    Clause claim was contrary to or an unreasonable application of federal law when it was issued in

4    light of the decisions of the United States Supreme Court in Crawford and/or Melendez-Diaz.[9]

5            After a thorough analysis of relevant federal law, the California Court of Appeal

6    concluded that the trial court did not violate petitioner's Sixth Amendment in admitting Medical

7    Examiner Dr. Omalu's trial testimony regarding statements made by Dr. Pakdaman in his autopsy

8    report.  For the reasons set forth below, the undersigned concludes that decision was not contrary

9    to or an unreasonable application of the Supreme Court's rulings in either Crawford or Melendez-

10   Diaz and therefore should not be set aside.  See Moses v. Payne, 555 F.3d 742, 754 (9th Cir.

11   2009) (when a Supreme Court decision does not "squarely address[ ] the issue in th[e] case" or

12   establish a legal principle that "clearly extend[s]" to a new context, "it cannot be said, under

13   AEDPA, there is 'clearly established' Supreme Court precedent addressing the issue before us,

14   and so we must defer to the state court's decision"); Brewer v. Hall, 378 F.3d 952, 955 (9th Cir.

15   2004) ("If no Supreme Court precedent creates clearly established federal law relating to the legal

16   issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or

17   an unreasonable application of clearly established federal law").

18   /////

19   _____

20   [8]  In Bullcoming, the Supreme Court held that the admission into evidence of a forensic lab
     prepared by a non-testifying analyst through the "surrogate testimony" of the analyst's colleague

21   who had neither performed nor observed the testing procedure violated the Confrontation Clause.
     131 S. Ct. at 2710, 2715-16.  Thereafter, in Williams, the Supreme Court held that an expert's

22   testimony referring to a DNA profile as having been produced from semen found on the victim
     did not violate the Confrontation Clause because an expert may express an opinion that is based

23   on facts that the expert assumes, but does not know, to be true.  132 S. Ct. at 2228.

24   [9]  In Greene, the Supreme Court had left open the question of "[w]hether § 2254(d)(1) would bar
     a federal habeas petitioner from relying on a decision that came after the last state-court

25   adjudication on the merits, but fell within one of the exceptions recognized in Teague, 489 U.S. at
     311, 109 S. Ct. 1060."  132 S. Ct. at 44 n.*  See also Teague v. Lane, 489 U.S. 288, 311 (1989)

26   ("[A] new rule should be applied retroactively if it places certain kinds of primary, private
     individual conduct beyond the power of the criminal law" or constitutes a "watershed rule[ ] of

27   criminal procedure." (internal quotation marks omitted)).  Here, petitioner does not argue that the
     decisions in Bullcoming or Williams fall within one of Teague's exceptions.

28

1    First, the decision of the state appellate court was not contrary to the holding in <u>Crawford</u>.

2    After <u>Crawford</u> was decided but prior to the Supreme Court's decision in <u>Melendez-Diaz</u>, it was

3    certainly not "clearly established" federal law that forensic reports were testimonial in nature.

4    <u>See</u> <u>Meras</u>, 676 F.3d at 1188-89 (recognizing that whether forensic lab reports were testimonial in

5    nature was an area of uncertainty over which federal appellate courts were divided sharply in the

6    wake of the decision in <u>Crawford</u>); <u>see</u> <u>also</u> <u>Flournoy</u>, 681 F.3d at 1004–05 (finding that it was

7    not an unreasonable application of the decision in <u>Crawford</u> to admit the testimony of an expert

8    witness regarding reports prepared by others where the witness' opinion was based on reports

9    which she had peer reviewed and where the reports had been admitted as business records).

10   Accordingly, the California Court of Appeal's conclusion that the autopsy report at issue here was

11   not "testimonial" in nature was not contrary to or an unreasonable application of federal law as

12   set forth in <u>Crawford</u>. <u>Meras</u>, 676 F.3d at 1188-89; <u>see</u> <u>also</u> <u>Flournoy</u>, 681 F.3d at 1004–05;

13   <u>McNeiece v. Lattimore</u>, 501 Fed. Appx. 634, 2012 WL 6757956 (9th Cir. Dec. 18, 2012) (holding

14   that a state court determination that petitioner's rights under the Confrontation Clause were not

15   violated when the trial court admitted excerpts of an autopsy report into evidence through the

16   testimony of a pathologist who had not conducted autopsy and where the pathologist testified in

17   reliance on the autopsy report, was not contrary to or an unreasonable application of <u>Crawford</u>

18   and that the state court's decision that the autopsy report was a non-testimonial business record

19   was not based on an unreasonable determination of the facts) [10]; <u>Kruger v. Katavich</u>, No. SACV–

20   12–1006–SVW (VBK), 2013 WL 2153954, at *6 (C.D. Cal. May 9, 2013) ("The Supreme Court

21   has never squarely addressed whether an autopsy report is a "testimonial" statement for <u>Crawford</u>

22   purposes.)

23   Second, the state appellate court's decision was also not contrary to the holding in

24   <u>Melendez-Diaz</u>. In <u>Melendez-Diaz</u>, a forensic laboratory report in the form of a "certificate of

25   analysis" was admitted into evidence without calling as a witness the analyst who had created the

26   report. The Supreme Court concluded that admission of this certificate violated the defendant's

27

28   [10]   Citation of this unpublished disposition by the Ninth Circuit Court of Appeals is appropriate
     pursuant to Fed. R. App. P. 32.1 and U.S. Ct. of App. 9th Cir. Rule 36-3(b).

1  right to confrontation.  Melendez-Diaz, 557 U.S. at 305.  The court reasoned that in the absence

2  of testimony by the analyst himself, the defendant "did not know what tests the analysts

3  performed, whether those tests were routine, and whether interpreting their results required the

4  exercise of judgment or the use of skills that the analysts may not have possessed."  Id. at 320.

5          Here, in contrast, the autopsy report prepared by Dr. Pakdaman appears not to have been

6  admitted into evidence at petitioner's trial.  (See Clerk's Transcript on Appeal (CT) at 478-88

7  (record of the People's exhibits)).  Rather, Dr. Omalu merely testified at trial regarding his own

8  independent opinion as a forensic pathologist as to the circumstances and cause of the victim's

9  death.  (Reporter's Transcript on Appeal (RT) at 918-19.)  Dr. Omalu's opinions were based on

10  the autopsy photographs, the autopsy report, the photographs of the scene of the crime, his own

11  examination of the physical evidence, his personal experience, or on a combination of these and

12  other matters.  (See, e.g., id. at 921-39, 950-54.)  Although Dr. Omalu's conclusions were the

13  same as those reached by Dr. Pakdaman in the autopsy report, Dr. Omalu testified that it was

14  common for him to disagree with other pathologists' reports due, in part, to his specialized and

15  additional knowledge.  (Id. at 954.)  Dr. Omalu was also extensively cross-examined by

16  petitioner's trial counsel at trial.  All of these facts distinguish this case from those confronted by

17  the Supreme Court in Melendez-Diaz.  See Meras, 676 F.3d at 1190 (noting that "Melendez-Diaz

18  involved a lab report submitted without live testimony, whereas Meras's case has the added

19  complication that the report was introduced through the testimony of the author's supervisor.");

20  Flournoy, 681 F.3d at 1002 (noting that in Melendez-Diaz the Supreme Court "held only that a

21  lab report could not be admitted without a witness appearing to testify in person").

22          Because of these distinctions, the conclusion of the California Court of Appeal that the

23  trial testimony of Dr. Omalu did not violate petitioner's Confrontation Clause rights was also not

24  contrary to or an unreasonable application of the Supreme Court's holding in Melendez-Diaz.

25  See Gauldin v. Cate, No. 12-CV-791-LAB-RBB, 2014 WL 4607838, at * (S.D. Cal. Sept. 15,

26  2014) (testimony of analyst about the contents of a DNA report prepared by a different analysis

27  did not violate the Confrontation Clause and the state court opinion to that effect was not contrary

28  to the holding in Melendez-Diaz); Graham v. Nash, No. CV 11-5723-DDP (OP), 2013 WL

1   3982271 at *15–17 (C.D. Cal. July 30, 2013) ("Because Melendez–Diaz dealt with the use of

2   affidavits instead of testimony, and this case dealt with the in-court testimony of a DNA expert, a

3   supervisor who actually conducted the analysis and reached an independent conclusion about the

4   DNA tests, the court of appeal' decision did not involve an unreasonable application of

5   Melendez–Diaz."); see also Wise v. Neotti, Case No. CV 11-6303-MMM (AJW), 2012 U.S. Dist.

6   LEXIS 160684 at *15 (C.D. Cal. Apr. 27, 2012) ("[F]airminded jurists could disagree about

7   whether Melendez–Diaz precluded the live testimony of a laboratory supervisor who reviewed

8   and signed a report prepared by another analyst.").

9        Indeed, even after the Supreme Court's decision in Bullcoming and Williams, it has been

10   recognized that there remains no clearly established federal law answering the question of the

11   degree to which an expert witness may rely and comment upon the out-of-court conclusions

12   reflected in lab report which were reached by one who is not called as a witness.  See United

13   States v. Pablo, 696 F.3d 1280, 1293 (10th Cir. 2012); Nardi v. Pope, 662 F.3d 107, 112 (1st Cir.

14   2011) ("Even now [in the wake of Bullcoming] it is uncertain whether, under its primary purpose

15   test, the Supreme Court would classify autopsy reports as testimonial."); see also Kruger, 2013

16   WL 2153954, at *7 (In the aftermath of Bullcoming and Williams there remains "no Supreme

17   Court precedent which clearly contradicts the California Court of Appeal's conclusion that Dr.

18   Juguilon could offer his expert opinion on the cause of death based on Dr. Halka's autopsy

19   report.")

20        Here, the California Court of Appeal concluded, after a careful analysis of federal law at

21   the time, that the autopsy report at issue here did not fall within the "core class of testimonial

22   statements" described by the United States Supreme Court in Crawford and Melendez-Diaz.

23   Specifically, the state appellate court noted that the autopsy report in petitioner's case had not

24   been sworn to before a notary, nor was it "formalized testimonial material, like an affidavit,

25   deposition, prior testimony, or confession."  Thompson, 2010 WL 4493478, at *7-8.  Reaching

26   this conclusion was not objectively unreasonable, given pronouncements in several United States

27   Supreme Court decisions to the effect that only formal, sworn documents constitute "testimonial

28   /////

21

1   statements."[11]  Under these circumstances, the undersigned "cannot say that the state court

2   unreasonably applied clearly established Federal law" in concluding that the autopsy report at

3   issue here was not "testimonial."  See Bailey v. Newland, 263 F.3d 1022, 1032 (9th Cir. 2001)

4   (where there was a difference of opinion between lower federal courts with regard to the issue in

5   that case, the state court's decision was not an unreasonable application of clearly established

6   federal law); see also Thompson v. Battaglia, 458 F.3d 614, 619 (7th Cir. 2006) ("The variety in

7   practice among the state courts and the various federal courts shows . . . that there is no standard

8   clearly established by the Supreme Court of the United States that is binding on all); see also

9   Lopez, 55 Cal.4th at 582 (while it is clear that in order to be "testimonial," an out-of-court

10  statement must have been made with "some degree" or formality or solemnity, "the degree of

11  formality required remains a subject of dispute in the United States Supreme Court").

12      For all of the foregoing reasons, petitioner is not entitled to federal habeas relief with

13  respect to his claim that the admission of Dr. Omalu's testimony at trial violated his rights under

14  the Confrontation Clause.[12]

15      **B.  Doyle Error**

16      In his next ground for relief, petitioner claims that both his Fifth Amendment right to due

17  process and his Sixth Amendment right to counsel were violated when Detective Rodriguez

18  testified at trial that petitioner made numerous requests for counsel during his police

19  interrogation.  (ECF No. 1 at 7.)  Petitioner points out that Detective Rodriguez "surprised

20  defense counsel by responding to a question about whether appellant requested medical care by

21

22  [11]  The undersigned also notes that the California Supreme Court has now held that statements in
     an autopsy report describing the condition of the murder victim's body are not "testimonial," as
23  that term is defined by the Supreme Court in the Crawford decision.  People v. Dungo, 55 Cal.
     4th 608, 627 (2012).
24
25  [12]  Before addressing petitioner's Confrontation Clause claim on the merits, the California Court
     of Appeal discussed whether petitioner waived that issue on appeal by failing to object to the
26  admission of Dr. Omalu's testimony at the time it was offered at his trial.  Respondent notes,
     however, that the state appellate court did not "affirmatively hold that the argument was
27  forfeited."  (ECF No. 15 at 20.)  Respondent therefore "presume[s] that petitioner's confrontation
     claim is not procedurally defaulted."  (Id.)  Accordingly, this court will not address the issue of
28  procedural default with respect to this claim.

22

1   repeatedly stating that appellant invoked his right to counsel."  (Id.)

2          The California Court of Appeal rejected this argument, reasoning as follows:

3              On appeal, defendant argues for the first time that "[i]t was . . .
4          improper for Detective Rodriguez to comment repeatedly that
           [defendant] requested counsel in response to every question posed
5          to him post-arrest."  Defendant asserts that Detective Rodriguez's
           testimony was "Doyle error" and "violate[d] the Sixth Amendment
6          right to counsel and the Fifth Amendment right to Procedural Due
           Process."

7              "Doyle v. Ohio . . . held that use, for impeachment purposes, of a
           defendant's silence at the time of arrest and after receipt of
8          Miranda[13] warnings violates due process.  An express assertion of
           rights must also be beyond exploitation by the prosecutor.
9          Otherwise, '[i]t cuts down on the privilege [against self-
           incrimination] by making its assertion costly' [citation].  Doyle,
10         supra, is not limited to in-custody situations, but is broadly
           interpreted to apply to any testimony about a defendant's desire or
11         request for counsel [citation]."  (People v. Fabert (1982) 127 Cal.
           App.3d 604, 609.)
12
               The People contend defendant forfeited his claim of Doyle error by
13         failing to object to Detective Rodriguez's testimony at trial.
           Defendant asserts "[t]he decisional precedent is in conflict on the
14         question of whether this error is subject to procedural default," but
           he then asks us to "[c]ompare" five California Supreme Court
15         decisions, dating from 1988 to 2008, in which that court found
           forfeiture, with two California Court of Appeal decisions, dating
16         from 1970 and 1984, in which those courts found no forfeiture.
           Under Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d
17         450, 455, we are bound by the decisions of our Supreme Court, so
           for us there is no conflict – defendant's claim of Doyle error "was
18         forfeited for appellate purposes by the lack of a contemporaneous
           objection."  (People v. Coffman and Marlow (2004) 34 Cal.4th 1,
19         63.)

20             Even if we were to reach this forfeited argument, it has no merit.
           Under Doyle, the prosecutor "is precluded from commenting on the
21         defendant's assertion of the right to counsel."  (People v. Coffman
           and Marlow, supra, 34 Cal.4th at p. 65.)  Here, the prosecutor
22         offered no such comment and did not elicit the testimony of which
           defendant complains; that testimony was elicited by defense
23         counsel.

24             Defendant asserts that Doyle applies not only to the prosecutor, but
           also to a "prosecution investigator," but he cites no authority for
25         that proposition.  All the cases he cites involved comment or
           questioning by the prosecutor.   Absent any authority for the
26         proposition that testimony by a police officer about the defendant's
           assertion of the right to counsel, elicited without objection by
27

28   ¹³  Miranda v. Arizona (1966) 384 U.S. 436 [16 L.Ed.2d 694].

                                        23

defense counsel (whether intentionally or not),[14] violates the
defendant's constitutional rights, we conclude defendant has not
shown <u>Doyle</u> error.

<u>Thompson</u>, 2010 WL 4493478, at *8-9.

As set forth above, the California Court of Appeal ruled, in part, that petitioner forfeited

his claim of <u>Doyle</u> error because his trial counsel failed to raise a contemporaneous objection to

the trial testimony of Detective Rodriguez.  Respondent argues the state court's finding of waiver

based on the lack of a contemporaneous objection constitutes a state procedural bar precluding

this court from addressing the merits of petitioner's claim of <u>Doyle</u> error.  (ECF No. 15 at 22-23).

State courts may decline to review a claim based on a procedural default.  <u>Wainwright v.</u>

<u>Sykes</u>, 433 U.S. 72, 86-87 (1977).  As a general rule, a federal habeas court "'will not review a

question of federal law decided by a state court if the decision of that court rests on a state law

ground that is independent of the federal question and adequate to support the judgment.'"

<u>Calderon v. United States District Court (Bean)</u>, 96 F.3d 1126, 1129 (9th Cir. 1996) (quoting

<u>Coleman v. Thompson</u>, 501 U.S. 722, 729 (1991)).  The state rule is only "adequate" if it is

"firmly established and regularly followed."  <u>Id.</u>  (quoting <u>Ford v. Georgia</u>, 498 U.S. 411, 424

(1991)).  <u>See also</u> <u>Bennett v. Mueller</u>, 322 F 3d 573, 583 (9th Cir. 2003) ("[t]o be deemed

adequate, the state law ground for decision must be well-established and consistently applied.")

The state rule must also be "independent" in that it is not "interwoven with the federal law."  <u>Park</u>

<u>v. California</u>, 202 F.3d 1146, 1152 (9th Cir. 2000) (quoting <u>Michigan v. Long</u>, 463 U.S. 1032,

1040-41 (1983)).  Even if the state rule is independent and adequate, the claims may be heard if

the petitioner can show:  (1) cause for the default and actual prejudice as a result of the alleged

violation of federal law; or (2) that failure to consider the claims will result in a fundamental

miscarriage of justice.  <u>Coleman</u>, 501 U.S. at 749-50.

/////

---

[14]  We accept defendant's argument that "Detective Rodriguez surprised defense counsel" when
the detective first mentioned that defendant asked for his attorney when the police asked
defendant if he wanted medical care, but it is clear that rather than objecting to and/or moving to
strike the detective's unexpected testimony, defense counsel instead chose to ask further
questions on the subject.

1    Respondent has met his burden of adequately pleading an independent and adequate state

2    procedural ground as an affirmative defense.  See Bennett, 322 F.3d at 586.  Petitioner does not

3    deny that his trial counsel failed to raise a contemporaneous objection to Detective Rodriguez's

4    testimony on the grounds of Doyle error.  Although the state appellate court proceeded to address

5    petitioner's Doyle error argument on the merits, it also expressly held that the issue was waived

6    on appeal because of defense counsel's failure to object at trial.  Petitioner has failed to meet his

7    burden of asserting specific factual allegations that demonstrate the inadequacy of California's

8    contemporaneous-objection rule as unclear, inconsistently applied or not well-established, either

9    as a general rule or as applied to him.  Bennett, 322 F.3d at 586; Melendez v. Pliler, 288 F.3d

10   1120, 1124-26 (9th Cir. 2002).  Petitioner's claim of Doyle error therefore appears to be

11   procedurally barred.  See Coleman, 501 U.S. at 747; Harris v. Reed, 489 U.S. 255, 264 n.10

12   (1989); Paulino v. Castro, 371 F.3d 1083, 1092-93 (9th Cir. 2004); see also Jackson v. Giurbino,

13   364 F.3d 1002, 1007 (9th Cir. 2004) (declining to address petitioner's Doyle error claim because

14   the state court decision that the claim was forfeited by lack of a contemporaneous objection was

15   based on "an independent and adequate state procedural rule" and because petitioner "cites no

16   case to establish that applying waiver to the alleged Doyle violation was contrary to clearly

17   established federal law, as determined by the Supreme Court of the United States").  Petitioner

18   has also failed to demonstrate that there was cause for his procedural default or that a miscarriage

19   of justice would result absent review of the claims by this federal habeas court.  See Coleman,

20   501 U.S. at 748; Vansickel v. White, 166 F.3d 953, 957-58 (9th Cir. 1999).

21        Nonetheless, even if this claim were not procedurally barred, the state appellate court's

22   decision that Doyle error did not occur in this case is not contrary to or an unreasonable

23   determination of federal law.  The United States Supreme Court held in Doyle that the

24   introduction of a defendant's post-arrest silence for impeachment purposes during cross-

25   examination by the prosecutor violates due process in cases in which the defendant may have

26   relied on his Miranda warnings in remaining silent.  Doyle, 426 U.S. at 618.  The court in Doyle

27   reasoned that it would be fundamentally unfair to apprise a defendant that he has the

28   constitutional right to remain silent and then use that silence against him at trial.  Id.; see also

25

1    United States v. Negrete-Gonzales, 966 F.2d 1277, 1280-81 (9th Cir. 1992) (finding Doyle error

2    when petitioner was questioned about his "post-Miranda silence"). The essence of the holding in

3    Doyle is that a prosecutor commits prosecutorial misconduct if he attempts to use a defendant's

4    post-arrest silence for impeachment purposes. See Greer v. Miller, 483 U.S. 756, 764-65 (1987).

5          Here, the prosecutor did not impeach petitioner with his post-arrest silence. Rather,

6    Detective Rodriguez volunteered during questioning by petitioner's own attorney that petitioner

7    had requested counsel during his police interrogation. Petitioner has not cited a United States

8    Supreme Court case holding that a trial witness' testimony, unsolicited by the prosecutor, that a

9    criminal defendant had requested counsel and declined to otherwise answer during police

10   questioning violates the holding in Doyle. Accordingly, the state appellate court's decision

11   rejecting petitioner's Doyle error argument on appeal is not contrary to or an unreasonable

12   application of federal law and should not be set aside.

13         **C. Insufficient Evidence**

14         Petitioner was charged in Count 5 of the information with "street terrorism," in violation

15   of California Penal Code § 186.22(a), in that he "did willfully and unlawfully actively participate

16   in a criminal street gang with the knowledge that the gang members did engage in a pattern of

17   criminal gang activity, and did willfully promote, further or assist in felonious criminal conduct

18   by members of that gang." (CT at 27.)[15]

19         In his third ground for federal habeas relief, petitioner claims that his conviction on the

20   charge of street terrorism must be reversed because it was not supported by sufficient evidence

21   admitted at his trial. (ECF No. 1 at 8.) He argues that the state court record "fails to prove that

22   the homicide was gang-related." (Id.) In support of this claim for relief, petitioner refers this

23   court to "argument IV" of his opening brief on appeal. (Id.) In this argument on appeal referred

24   to by petitioner he claimed that "the gang enhancement and gang count must be reversed for

25   insufficient evidence," (emphasis added), notwithstanding the fact that he was not charged with a

---

26   [15] Petitioner was not charged with violating California Penal Code § 186.22(b), which mandates

27   a sentence enhancement for "any person who is convicted of a felony committed for the benefit

     of, at the direction of, or in association with any criminal street gang, with the specific intent to

28   promote, further, or assist in any criminal conduct by gang members."

gang enhancement pursuant to California Penal Code § 186.22(b).  (Resp't's Lod. Doc. 1 at 54.)

More specifically, petitioner argued on appeal that the record failed to "contain substantial

evidence that the homicide was committed for the benefit of, at the direction of, or in association

with a criminal street gang," as required by Penal Code § 186.22(b).  (Id. at 61-65.)  Petitioner

also argued that the record failed to contain substantial evidence that "the homicide was

committed with the specific intent to promote, further, or assist in criminal conduct by gang

members," which is also a required finding under Penal Code § 186.22(b).  (Id. at 65-67.)

The California Court of Appeal rejected petitioner's arguments in this regard, reasoning as

follows:

> **The Street Terrorism Count**
>
> Defendant contends "[t]he prosecution proceeded primarily upon a theory that [defendant] killed [Orsino], because she told him that she was breaking up with him," and therefore "the gang enhancement finding and gang count are not supported by substantial evidence."  As the People point out, however, defendant was not charged with a "gang enhancement."  As for the "gang count" – i.e., the charge of street terrorism – it turns out defendant does not offer any argument directed at the elements of that crime.
>
> Under subdivision (a) of section 186.22, a person "who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang" is guilty of the crime sometimes called street terrorism.  Subdivision (b) of that statute provides a separate criminal street gang sentence enhancement for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."
>
> Here, defendant's sufficiency of the evidence argument is directed –or rather, misdirected – at the elements of the criminal street gang enhancement, which was not charged here.  First, he argues that "[t]he record fails to contain substantial evidence that the homicide was committed for the benefit [of], at the direction of, or in association with a criminal street gang."  Second, he argues that "[t]he record is lacking in evidence that, if the homicide was intentional, [defendant] killed [Orsino] with the specific intent to advance other criminal conduct by gang members."  Then he contends that "[f]or the reasons discussed in this argument, the gang enhancement and gang count are not supported by substantial evidence and must be reversed."

/////

27

1
2
3
4
5
6
7
8

> In a criminal case, "to prevail on a sufficiency of the evidence argument, the defendant must . . . set forth in his opening brief *all* of the material evidence *on the disputed elements of the crime* in the light most favorable to the People, and then must persuade us that evidence cannot reasonably support the jury's verdict." (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1574, second italics added.) Obviously, a defendant cannot carry this burden of persuasion if he fails to address any of the elements of the crime at issue, let alone the disputed elements of that crime. Such is the case here. Because defendant's sufficiency of the evidence argument addresses only elements of the criminal street gang sentence enhancement that was not charged here and does not address any of the elements of the crime of street terrorism that was charged,[16] defendant has not carried his burden of persuading us the evidence was insufficient to support his conviction for that crime.

9   *Thompson*, 2010 WL 4493478, at **13-14.

10      Respondent argues the state court's finding that petitioner failed to support his claim of

11  insufficient evidence with citations to the trial court record and relevant law constitutes a state

12  procedural bar precluding this court from addressing the merits of petitioner's claim of

13  insufficient evidence. (ECF No. 15 at 25.) As noted above, "[a] federal habeas court will not

14  review a claim rejected by a state court 'if the decision of [the state] court rests on a state law

15  ground that is independent of the federal question and adequate to support the judgment." *Martin*,

16  131 S. Ct. at 1127. However, a reviewing court need not invariably resolve the question of

17  procedural default prior to ruling on the merits of a claim. *Lambrix v. Singletary*, 520 U.S. 518,

18  524-25 (1997); *see also* *Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural

19  bar issues are not infrequently more complex than the merits issues presented by the appeal, so it

20  may well make sense in some instances to proceed to the merits if the result will be the same");

21  *Busby v. Dretke*, 359 F.3d 708, 720 (5th Cir. 2004) (noting that although the question of

22  procedural default should ordinarily be considered first, a reviewing court need not do so

23  invariably, especially when the issue turns on difficult questions of state law). Thus, where

24  deciding the merits of a claim proves to be less complicated and less time-consuming than

25  adjudicating the issue of procedural default, a court may exercise discretion to reject the claim in

26  its merits and forgo an analysis of procedural default. *See* *Boyd v. Thompson*, 147 F.3d 1124,

27

---

28  [16]  For example, defendant does not argue there was insufficient evidence that he "willfully promote[d], further[ed], or assist[ed] in any felonious criminal conduct by members of that gang."

28

1    1127 (9th Cir. 1998); Batchelor v. Cupp, 693 F.2d 859, 864 (9th Cir. 1982).  Under the

2    circumstances presented here, the undersigned finds that petitioner's claim of insufficient

3    evidence can be resolved more easily by addressing it on the merits.  Accordingly, this court will

4    assume that petitioner's claim of insufficient evidence is not procedurally defaulted.

5         The Due Process Clause "protects the accused against conviction except upon proof

6    beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

7    charged." In re Winship, 397 U.S. 358, 364 (1970).  There is sufficient evidence to support a

8    conviction if, "after viewing the evidence in the light most favorable to the prosecution, any

9    rational trier of fact could have found the essential elements of the crime beyond a reasonable

10   doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).  "[T]he dispositive question under

11   Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a

12   reasonable doubt.'" Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443

13   U.S. at 318).  Put another way, "a reviewing court may set aside the jury's verdict on the ground

14   of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos

15   v. Smith, ___ U.S. ___, ___, 132 S. Ct. 2, 4 (2011).

16        In conducting federal habeas review of a claim of insufficiency of the evidence, "all

17   evidence must be considered in the light most favorable to the prosecution." Ngo v. Giurbino,

18   651 F.3d 1112, 1115 (9th Cir. 2011).  "Jackson leaves juries broad discretion in deciding what

19   inferences to draw from the evidence presented at trial," and it requires only that they draw

20   "'reasonable inferences from basic facts to ultimate facts.'" Coleman v. Johnson, ___ U.S. ___,

21   ___, 132 S. Ct. 2060, 2064 (2012) (citation omitted).  "'Circumstantial evidence and inferences

22   drawn from it may be sufficient to sustain a conviction.'" Walters v. Maass, 45 F.3d 1355, 1358

23   (9th Cir. 1995) (citation omitted).[17]

24         "A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging

25   the sufficiency of the evidence used to obtain a state conviction on federal due process grounds."

26

_____

27   [17]  The federal habeas court determines sufficiency of the evidence in reference to the substantive
     elements of the criminal offense as defined by state law.  Jackson, 443 U.S. at 324 n.16; Chein,
28   373 F.3d at 983.

1    <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir. 2005).  In order to grant relief, the federal habeas

2    court must find that the decision of the state court rejecting an insufficiency of the evidence claim

3    reflected an objectively unreasonable application of <u>Jackson</u> and <u>Winship</u> to the facts of the case.

4    <u>Ngo</u>, 651 F.3d at 1115; <u>Juan H.</u>, 408 F.3d at 1275 & n.13.  Thus, when a federal habeas court

5    assesses a sufficiency of the evidence challenge to a state court conviction under AEDPA, "there

6    is a double dose of deference that can rarely be surmounted."  <u>Boyer v. Belleque</u>, 659 F.3d 957,

7    964 (9th Cir. 2011).

8          In this case, as noted by the California Court of Appeal, petitioner's arguments, which are

9    contained in his opening brief on appeal, are directed to the sufficiency of the evidence to support

10   a sentence enhancement with which he was not charged.  Petitioner does not address the

11   sufficiency of the evidence to support his conviction of violating California Penal Code §

12   186.22(a) as charged in Count 5 of the information.  Under these circumstances, petitioner has

13   failed to meet his burden of showing that the evidence introduced at his trial was insufficient to

14   support his conviction on the charge of participation in a criminal street gang.  <u>See</u> <u>Jones v.</u>

15   <u>Gomez</u>, 66 F.3d 199, 204 (9th Cir. 1995) ("'Conclusory allegations which are not supported by a

16   statement of specific facts do not warrant habeas relief'") (quoting <u>James v. Borg</u>, 24 F.3d 20, 26

17   (9th Cir. 1994)). [18]

18         Nor is petitioner entitled to federal habeas relief on the merits of his claim that the

19   evidence admitted at his trial was of insufficient to support his conviction on the street terrorism

20   charge.  The substantive offense defined in California Penal Code § 186.22(a) has three elements:

21             Active participation in a criminal street gang, in the sense of
22             participation that is more than nominal or passive, is the first
               element of the substantive offense defined in section 186.22(a).
23             The second element is "knowledge that [the gang's] members

24   _____

     [18]   The court notes that in his petition for review filed in the California Supreme Court, petitioner
25   deleted reference to Penal Code § 186.22(b), the gang enhancement, and claimed only that his
     conviction on the gang offense under Penal Code § 186.22(a)) was not supported by sufficient
26   evidence.  (Resp't's Lod. Doc. 5 at 23-29.)  However, as noted above, the California Supreme
     Court dismissed the original grant of review in petitioner's case and declined to reach petitioner's
27   claims on the merits.  (Resp't's Lod. Doc. 6, 7.)  Accordingly, the decision of the California Court
     of Appeal is the relevant "last reasoned" decision for this court's review under AEDPA of
28   petitioner's claims.

engage in or have engaged in a pattern of criminal gang activity," and the third element is that the person "willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang."

People v. Lamas, 42 Cal.4th 516, 523 (2007). As petitioner argued in his opening brief on appeal:

The prosecution presented evidence that [petitioner] wore clothing consistent with gang membership, associated with people that police considered gang members, told people that he was a gang member, pled guilty to active participation in a criminal street gang after his arrest in the Blossom Circle shooting case, was photographed making gang signs and wearing gang-related attire, authored gang-related writings, and had more gang tattoos when arrested in this case than at the time of the Blossom Circle shooting.

(Resp't's Lod. Doc. 1 at 59.) Prosecution gang expert Detective Michael George testified that the North Side Gangster Crips (NSGC), petitioner's gang, is a Stockton criminal street gang. (RT at 1882-88.) According to Detective George's trial testimony, the primary activities of the NSGC was homicide, auto theft, gun violations, narcotics trafficking, and robbery. (Id. at 1887-88.) Detective George also testified that petitioner was a member of the NSGC and that the murder in this case promoted and furthered petitioner's gang by preventing the victim from informing on the gang's activities, which she had witnessed and was aware of. (Id. at 1893-94, 1909-10, 1939-40.) In addition, Clarice Milton testified that she and the victim had witnessed a gang-related shooting and armed robbery committed by petitioner and his fellow gang members the night before Orsino's murder. (Id. at 1108-1113.) The next day, petitioner pointed a gun at the two women while discussing his gang affiliation. (Id. at 1182-90, 1906-08.) Based on all of this evidence which was introduced at petitioner's trial, the state appellate court decision that the evidence introduced at trial was sufficient to support petitioner's conviction for violating Penal Code § 186.22(a) is not contrary to or an unreasonable application of Jackson and In re Winship to the facts of this case. Smith, 132 S. Ct. at 4. A rational juror could have found the essential elements of the crime of participation in a street gang in violation of Penal Code § 186.22(a) beyond a reasonable doubt based upon that evidence.

/////

1    Accordingly, for all of the foregoing reasons, petitioner is not entitled to federal habeas

2 relief on his insufficiency of the evidence claim.

3    **D.  Sentencing Error**

4    In his final ground for federal habeas relief, petitioner claims that his sentence on Count 5

5 must be stayed "because Counts 1 and 5 punish the identical act."  (ECF No. 1 at 10.)  The

6 California Court of Appeal rejected this argument on state law grounds, reasoning, in full, as

7 follows:

8    Defendant contends his sentence for street terrorism must be stayed under section 654 because this charge and the murder charge were based on the same act.  We disagree.

9

10    In pertinent part, subdivision (a) of section 654 provides that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

11

12

13

14    "Because of the many differing circumstances wherein criminal conduct involving multiple violations may be deemed to arise out of an 'act or omission,' there can be no universal construction which directs the proper application of section 654 in every instance."  (People v. Beamon (1973) 8 Cal.3d 625, 636.)  Nevertheless, our Supreme Court has set forth some basic principles for applying the statute.

15

16

17

18    In Neal v. State of California (1960) 55 Cal.2d 11, the court explained "'[i]t is the singleness of the act and not of the offense that is determinative.'  Thus the act of placing a bomb into an automobile to kill the owner may form the basis for a conviction of attempted murder, or assault with intent to kill, or malicious use of explosives.  Insofar as only a single act is charged as the basis for the conviction, however, the defendant can be punished only once."  (Id. at p. 19.)

19

20

21

22    But our Supreme Court has also explained that "section 654 refers not to any physical act or omission which might perchance be common to all of a defendant's violations, but to a defendant's criminal acts or omissions."  (In re Hayes (1969) 70 Cal.2d 604, 607.)  "The proper approach, therefore, is to isolate the various criminal acts involved, and then to examine only those acts for identity."  (Ibid.)

23

24

25

26    In Hayes, a majority of our Supreme Court concluded that a defendant who "drove a motor vehicle for some 13 blocks" while under the influence of intoxicating liquor and with knowledge that his driver's license was suspended engaged simultaneously in two distinct criminal acts - "driving with a suspended license and

27

28

driving while intoxicated" - and could be punished for both, even though both criminal acts had in common the noncriminal act of "driving."  (In re Hayes, supra, 70 Cal.2d at pp. 605, 607-608.) Thus, even in a case in which two offenses are based on the same physical act, section 654 may not prohibit punishing the defendant for both offenses.  The pertinent question is whether both offenses are based on the same criminal act.

To complicate matters further, even when more than one criminal act is shown, section 654 still may bar multiple punishment in some circumstances.  This is so because "'[s]ection 654 has been applied not only where there was but one "act" in the ordinary sense . . . but also where a course of conduct violated more than one statute and the problem was whether it comprised a divisible transaction which could be punished under more than one statute within the meaning of section 654.' [Citation.] [¶]   Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor.  If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one."  (Neal v. State of California, supra, 55 Cal.2d at p. 19.)  And "[j]ust as it is the criminal 'act or omission' to which section 654 refers, it is the criminal 'intent and objective'" to which Neal refers.  (In re Hayes, supra, 70 Cal.2d at p. 610.)

With these principles in mind, we turn back to the present case.  As we have explained, under subdivision (a) of section 186.22, it is a crime to actively participate in a criminal street gang with knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity, and to willfully promote, further, or assist in any felonious criminal conduct by members of the gang. Here, in pretrial discussions between the court and counsel, the prosecutor made it "clear" that with respect to the charge of street terrorism, "the felonious conduct [defendant] engaged in was the homicide itself."  Shortly thereafter, the prosecutor reiterated, "In order to prove the [street terrorism charge] I have to prove that the defendant did something felonious. [¶] . . . [¶]  Here it's the murder . . . . [¶] . . . [¶] . . . The felonious conduct is the murder."[19]

Consistent with this approach, in closing argument the prosecutor asserted defendant "promoted the gang[']s conduct by not letting [Orsino] disrespect him, nor the gang.  How so?  Because on the night of May 24th, 2008, when [Orsino] was going to break up with the defendant, he shot and killed her.  Because had [she] broken up with [him] the day after they did all those shootings, the day after

---

[19]   Even though the statute refers to "promot[ing], further[ing], or assist[ing] in any felonious criminal conduct by members of th[e] gang," courts have concluded that the crime of street terrorism applies to the person who actually perpetrates the felonious gang-related criminal conduct as well as to a person who only promotes, furthers, or assists in that conduct.  (E.g., People v. Ngoun (2001) 88 Cal. App.4th 432, 436.)  Defendant does not argue otherwise here.

all that happened,[20] he not only would have been disrespected because his girlfriend dumped him, but the gang would have been worried, who is she going to tell?  He promoted their conduct by getting rid of witnesses.  Snitches, as he calls them.  During the commission of [the crime of street terrorism], we know he was armed with a firearm . . . .   He did personally discharge it when he shot [Orsino], and he intended to do that."

Thus it is clear the charges of murder and street terrorism were based on the very same physical act - the shooting of Orsino.  Under the authorities discussed above, however, that does not resolve the question of whether section 654 applies here, because, as we have seen, a single physical act may nonetheless constitute two distinct criminal acts for purposes of section 654.  And if the shooting of Orsino can be deemed to constitute two distinct criminal acts, then the application of section 654 depends on whether defendant can be deemed to have entertained two distinct criminal objectives in committing those acts.

Skipping over the question of whether the shooting of Orsino constituted two distinct criminal acts, the People argue that punishment for both murder and street terrorism was proper here because "the two offenses involve[d] different objectives." According to the People, defendant "had the personal objective of killing the woman who had broken up with him and threatened to abort his child.  However, he also had an objective to participate in a criminal street gang by eliminating a witness to the criminal activities of his gang, spreading the fear of his gang and avenging a perceived act of 'disrespect' shown by the victim."

Defendant suggests the two objectives the People identify are not distinct for purposes of applying section 654.   In his view, "[a]ccording to the prosecution's gang expert, the killing was committed to silence a potential witness and to retaliate for disrespect pursuant to gang culture tenets."  Thus, what the People characterize as "the personal objective of killing the woman who had broken up with him and threatened to abort his child," defendant characterizes as the gang-related objective of "retaliat[ing] for disrespect."  In defendant's view, because "the underlying crime [murder] was not independent of the gang allegations, section 654 applies to preclude separate punishment for the gang crime."

We do not find that either party's parsing of defendant's supposed "objectives" in shooting Orsino provides a satisfactory basis for deciding whether the trial court properly (albeit implicitly) determined that section 654 did not apply here.  Consequently, we turn to some of the cases in which the appellate courts have dealt with the application of section 654 to a conviction for street terrorism and one or more other offenses to see what assistance those decisions provide.

---

[20]   The prosecution presented evidence of an incident the night before Orsino was killed in which Orsino supposedly saw defendant and his compatriots harm a person.

In People v. Herrera (1999) 70 Cal.App.4th 1456, the defendant personally used a firearm in a gang-related drive-by shooting and was convicted of (among other things) two counts of attempted murder and one count of street terrorism.  (Id. at pp. 1460-1462.)  On appeal, Division Three of the Fourth Appellate District concluded defendant could be separately punished for street terrorism and attempted murder based on the following analysis:

"The characteristics of attempted murder and street terrorism are distinguishable, even though aspects of one may be similar to those of the other.  In the attempted murders, Herrera's objective was simply a desire to kill.  For these convictions, the identities (or gang affiliations) of his intended victims were irrelevant.  The fact he repeatedly shot a gun on two separate occasions - the interval between the two being brief but distinct - striking cars, occupied apartments and bystanders, is sufficient to establish the specific intent to kill required for both counts of attempted murder.  [Citations.]

"In contrast, section 186.22, subdivision (a), encompasses a more complex intent and objective.  It is part of the Street Terrorism Enforcement and Prevention Act which was enacted by emergency legislation in 1988.  [Citations.]   The Legislature passed these criminal penalties and strong economic sanctions as a response to the increasing violence of street gang members throughout the state.  Previously, there was no existing law that made the punishment for crimes by a gang member separate and distinct from that of the underlying crimes. [Citation.]

"Section 186.22, subdivision (a) punishes active gang participation where the defendant promotes or assists in felonious conduct by the gang.   It is a substantive offense whose gravamen is the participation in the gang itself.   Hence, under section 186.22, subdivision (a) the defendant must necessarily have the intent and objective to actively participate in a criminal street gang.  However, he does not need to have the intent to personally commit the particular felony (e.g., murder, robbery or assault) because the focus of the street terrorism statute is upon the defendant's objective to promote, further or assist the gang in its felonious conduct, irrespective of who actually commits the offense.   For example, this subdivision would allow convictions against both the person who pulls the trigger in a drive-by murder and the gang member who later conceals the weapon, even though the latter member never had the specific intent to kill.  Hence, section 186.22, subdivision (a) requires a separate intent and objective from the underlying felony committed on behalf of the gang.   The perpetrator of the underlying crime may thus possess 'two independent, even if simultaneous, objectives[,]' thereby precluding application of section 654. [Citation.]

"Herrera's active participation in [his gang's] 'payback' against [a rival gang] falls squarely within the provisions of section 186.22, subdivision (a), street terrorism.   It requires the defendant to actively participate in a criminal street gang, have knowledge that its members engage in criminal activity, and have the intent and

35

objective to further the gang's felonious conduct.  (§ 186 .22, subd. (a.)  Independent of that, Herrera had the simultaneous although separate objective to actively participate in and promote his gang when he attempted to murder [the rival] gang members.  Herrera's membership in [his gang] was well established at trial, including expert testimony regarding what such a membership entailed. Herrera testified he got into the Mustang to 'back up' or support the gang.  He had told his girlfriend that his gang was going to retaliate against [the rival gang].  The gang experts explained that gang warfare uniformly involved guns.   The evidence supports the finding that Herrera intended to aid his gang in felonious conduct, irrespective of his independent objective to murder.

"Finally, if section 654 were held applicable here, it would render section 186.22, subdivision (a) a nullity whenever a gang member was convicted of the substantive crime committed in furtherance of the gang.   '[T]he purpose of section 654 "is to insure that a defendant's punishment will be commensurate with his culpability." [Citation.]' [Citation.]   We do not believe the Legislature intended to exempt the most culpable parties from the punishment under the street terrorism statutes." (People v. Herrera, supra, 70 Cal.App.4th at pp. 1466-1468, fns. omitted.)

In People v. Ferraez (2003) 112 Cal.App.4th 925, the defendant was convicted of possessing cocaine base for sale and street terrorism on the theory he was selling the rock cocaine for the criminal street gang to which he belonged.  (Id. at pp. 927-929.) On appeal, another panel from Division Three of the Fourth Appellate District followed Herrera and concluded that "the trial court was not required to stay defendant's sentence for the gang crime" because "defendant possessed the drugs with the intent to sell, and he also intended to commit that felony to promote or assist the gang.   While he may have pursued both objectives simultaneously, they were nonetheless independent of each other." (Id. at p. 935.)

In People v. Vu (2006) 143 Cal.App.4th 1009, the defendant was convicted of conspiracy to commit murder and street terrorism for a gang-related revenge shooting.  (Id. at pp. 1012-1013.)  On appeal, another panel of Division Three of the Fourth Appellate District concluded the sentence for street terrorism should have been stayed under section 654 because "the acts of conspiracy and street terrorism constituted a criminal course of conduct with a single intent and objective.  That single criminal intent or objective was to avenge [a fellow gang member's] killing by conspiring to commit murder.  Although that intent or objective could be parsed further into intent to promote the gang and intent to kill, those intents were not independent.  Each intent was dependent on, and incident to, the other."  (Id. at p. 1034.)

Rather than disagree with Herrera and Ferraez, the Vu court claimed those cases were distinguishable.  (People v. Vu, supra, 143 Cal.App.4th at p. 1034.)   The court claimed Herrera was distinguishable "because the defendant was charged with a course of criminal conduct involving two gang-related, drive-by shootings

36

in which two people were injured," and <u>Ferraez</u> was distinguishable "because under the facts of that case, the trial court could have found independent objectives." (<u>Vu</u>, at p. 1034.)

In <u>People v. Garcia</u> (2007) 153 Cal.App.4th 1499, the defendant was convicted of carrying a loaded unregistered firearm in public and street terrorism on the theory that he was carrying the firearm for the benefit of a criminal street gang. (<u>Id.</u> at p. 1502.) On appeal, another panel of Division Three of the Fourth Appellate District, without mentioning <u>Vu</u>, followed <u>Herrera</u> and <u>Ferraez</u> and determined that defendant could be punished for both crimes because he "knew he was in possession of a firearm in public, and intended to commit that crime to promote or assist the gang. While he might have pursued these objectives simultaneously, they were independent of each other." (<u>Id.</u> at p. 1514, fn. omitted.)

In <u>People v. Sanchez</u> (2009) 179 Cal.App.4th 1297, the defendant was convicted of robbery and gang participation (street terrorism). (<u>Id.</u> at p. 1301.) On appeal, Division Two of the Fourth Appellate District concluded that "section 654 precludes multiple punishment for both (1) gang participation, one element of which requires that the defendant have 'willfully promote[d], further[ed], or assist[ed] in any felonious criminal conduct by members of th[e] gang," and "(2) the underlying felony that is used to satisfy this element of gang participation." (<u>Sanchez</u>, at p. 1301.) In reaching this conclusion, the court considered both <u>Herrera</u> and <u>Vu</u> at some length. (<u>Sanchez</u>, at pp. 1310-1313.) The court noted that "<u>Vu</u>'s effort to distinguish <u>Herrera</u> was less than satisfying" and concluded that "<u>Herrera</u> simply cannot be reconciled with <u>Vu</u>." (<u>Sanchez</u>, at pp. 1312-1313.) Then, after discussing "a number of problems" the court found with <u>Herrera</u>, the <u>Sanchez</u> court explained why section 654 barred separate punishment for gang participation in the case before it:

"Here, the underlying robberies were the act that transformed mere gang membership - which, by itself, is not a crime - into the crime of gang participation. Accordingly, it makes no sense to say that defendant had a different intent and objective in committing the crime of gang participation than he did in committing the robberies . . . .

"In our view, the crucial point is that, here, as in <u>Herrera</u> and <u>Vu</u>, the defendant stands convicted of both (1) a crime that requires, as one of its elements, the intentional commission of an underlying offense, and (2) the underlying offense itself." (<u>People v. Sanchez</u>, <u>supra</u>, 179 Cal. App.4th at p. 1315.)

The <u>Sanchez</u> court concluded that "the robberies - even if not gang motivated - were necessary to satisfy an element of the gang participation charge . . . . Accordingly, almost by definition, defendant had to have the same intent and objective in committing

/////

/////

37

all of these crimes."[21]   (People v. Sanchez, supra, 179 Cal . App.4th at p. 1316.)

The foregoing cases do not reveal a consistent line of reasoning for applying section 654 to cases, like the present one, where the defendant is convicted both of street terrorism and another felony, where the other felony is the "felonious criminal conduct" of the gang that is used to establish the charge of street terrorism.[22] Defendant argues that "[t]his case falls within the Vu rationale," while the People contend "[t]his case is closer factually to Herrera than it is to Vu."  For the reasons that follow, we believe the result reached in Herrera and its progeny is the correct one here.

The first question under section 654 is whether the two offenses involved the same criminal act or distinct criminal acts.  We believe that, as a general matter, when the two offenses are a charge of street terrorism that is based on an underlying felony committed by the defendant and that underlying felony, two distinct criminal acts are involved.  This is so because the charge of street terrorism is not based only on the underlying felony that serves as the "felonious criminal conduct" the statute requires, but is also based on the defendant's "active[ ] participat[ion] in [the] criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (a).)  Indeed, as the Herrera court observed, participation in the gang is the gravamen of the crime of street terrorism.   (People v. Herrera, supra, 70 Cal.App.4th at p. 1467.)

Under this reasoning, the murder charge was based on a criminal act distinct from the street terrorism charge, even though both offenses had in common the shooting of Orsino.  It does not necessarily follow from that conclusion, however, that defendant can be punished separately for both acts, because we must still examine his criminal "intent and objective" under Neal.

In Neal, the defendant was convicted "of one count of arson and two counts of attempted murder [based] upon [his] act of throwing gasoline into the bedroom of [a married couple] and igniting it." (Neal v. State of California, supra, 55 Cal.2d at p. 18.)   In concluding that the defendant could not be separately punished for arson, the Supreme Court wrote as follows:

/////

---

[21]   Sanchez involved the anomalous situation where the jury found gang enhancement allegations on the robbery counts not true (People v. Sanchez, supra, 179 Cal. App.4th at p. 1301) - thus finding the defendant did not commit the robberies for the benefit of, at the direction of, or in association with the gang - but nonetheless found the defendant guilty of gang participation apparently on the theory that the felonious criminal conduct of the gang that he promoted and furthered was the very robberies he committed (id. at pp. 1305-1308).

[22]   This issue is now before our Supreme Court in People v. Mesa (2010) 186 Cal.App.4th 773, review granted October 27, 2010, S185688.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

> "If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one. [¶] . . . [¶]  In the instant case the arson was the means of perpetrating the crime of attempted murder . . . . [Separate punishment for the arson] violated . . . section 654, since the arson was merely incidental to the primary objective of killing [the couple]."  (Neal v. State of California, supra, 55 Cal.2d at pp. 19-20.)
>
> In effect, the court in Neal concluded the defendant had only one criminal objective - murdering the couple.  Because the crime of arson was merely the means by which the defendant sought to accomplish that single objective, the defendant could not be punished for both attempted murder and arson under section 654.
>
> We do not believe the reasoning from Neal compels the conclusion here that defendant can be punished only for the murder of Orsino and not for the crime of street terrorism as well.  Unlike in Neal, where the arson was merely "the means of perpetrating the crime of attempted murder," here one crime was not merely the means of perpetrating the other.  On this point, it is important to emphasize that street terrorism requires not only the commission of "felonious criminal conduct by members of [a] gang," but also "active[ ] participat[ion] in [the] gang" separate and apart from that felonious conduct.  (See People v. Castenada (2000) 23 Cal.4th 743, 752 [describing "section 186.22(a)'s plainly worded requirements" as "criminal knowledge, willful promotion of a felony, and active participation in a criminal street gang"].)  Thus, while the murder of Orsino was part of the street terrorism crime, the two crimes were not coextensive, and thus the murder was not simply the means by which defendant committed street terrorism, as the arson was the means by which the defendant committed attempted murder in Neal.  Under this circumstance, the trial court was not bound to conclude both crimes involved only a single objective, such that only one punishment could be imposed for both crimes.
>
> Accordingly, the trial court did not err in failing to stay the sentence on the street terrorism charge pursuant to section 654.

21

Thompson, 2010 WL 4493478, at *13-19.

22

        Of course, federal habeas corpus relief is unavailable for alleged errors in the

23

interpretation or application of state sentencing laws by either a state trial court or appellate court.

24

See Richmond v. Lewis, 506 U.S. 40, 50 (1992) (the question to be decided by a federal court on

25

petition for habeas corpus is not whether the state committed state-law error but whether the state

26

court's action was "so arbitrary or capricious" as to constitute an independent violation of the

27

federal constitution).  "State courts are the ultimate expositors of state law," and a federal habeas

28

court is bound by the state's construction except when it appears that its interpretation is an

39

1    obvious subterfuge to evade the consideration of a federal issue.  Mullaney v. Wilbur, 421 U.S.

2    684, 691 (1975).  See also McElroy v. Holloway, 451 U.S. 1028, 1031 (1981); Horton v. Mayle,

3    408 F.3d 570, 576 (9th Cir. 2005).  So long as a state sentence "is not based on any proscribed

4    federal grounds such as being cruel and unusual, racially or ethnically motivated, or enhanced by

5    indigency, the penalties for violation of state statutes are matters of state concern."  Makal v.

6    State of Arizona, 544 F.2d 1030, 1035 (9th Cir. 1976).  "Generally, a federal appellate court may

7    not review a state sentence that is within the statutory limits."  Walker v. Endell, 850 F.2d 470,

8    476 (9th Cir. 1987).  Thus, "[a]bsent a showing of fundamental unfairness, a state court's

9    misapplication of its own sentencing laws does not justify federal habeas relief."  Christian v.

10   Rhode, 41 F.3d 461, 469 (9th Cir. 1994).

11         Applying these principles in federal habeas proceedings, the Ninth Circuit has specifically

12   refused to consider alleged errors in the application of state sentencing law.  For instance, the

13   Ninth Circuit has refused to examine the state court's determination that a defendant's prior

14   conviction was a "serious felony" within the meaning of the state statutes governing application

15   of sentence enhancements.  Miller v. Vasquez, 868 F.2d 1116, 1118-19 (9th Cir. 1989).  In Miller

16   the court did not reach the merits of the petitioner's claim, stating that federal habeas relief is not

17   available for alleged errors in interpreting and applying state law.  Id.  (quoting Middleton, 768

18   F.2d at 1085).  The Ninth Circuit has also held that "[t]he decision whether to impose sentences

19   concurrently or consecutively is a matter of state criminal procedure and is not within the purview

20   of federal habeas corpus."  Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994).  Finally,

21   the Ninth Circuit has concluded that petitioner's claim regarding merger of convictions for

22   sentencing was exclusively concerned with state law and therefore not cognizable in a federal

23   habeas corpus proceeding.  Hendricks v. Zenon, 993 F.2d 664, 674 (9th Cir. 1993).

24         Whether or not a state criminal sentence on one charge must be stayed under California

25   Penal Code § 654 because the conduct at issue involves the same act as another count of

26   conviction involves an interpretation of a state sentencing statute.  Watts v. Bonneville, 879 F.2d

27   685, 687 (9th Cir.1989) (petitioner's claim that his sentence violated California Penal Code § 654

28   was not cognizable on federal habeas review); Cartwright v. Junious, No. 1:12-cv-0045-LJO-JLT,

1    2014 WL 6965649, at *15 (E.D. Cal. Dec. 9, 2014) ("No such subterfuge appears in this record.

2    Thus, the issue related to whether California Penal Code § 654 was properly applied to

3    Petitioner's case fails to raise a cognizable federal habeas corpus claim.); <u>Arriaga v. Gonzales</u>,

4    No. EDCV 13-1372-AG (JPR), 2014 WL 5661023, at *21 (C.D. Cal. Oct. 31, 2014) ("Whether

5    the trial court erred in applying section 654 is not cognizable on federal habeas review because it

6    involves only the application and interpretation of state law."). Here, there is no suggestion that

7    the decision of the California Court of Appeal interpreting California law was "untenable or

8    amounts to a subterfuge to avoid federal review of a constitutional violation." <u>Oxborrow v.</u>

9    <u>Eikenberry</u>, 877 F.2d 1395, 1399 (9th Cir. 1989).) Nor has petitioner made any showing that the

10   state appellate court's interpretation of state law, specifically Penal Code § 654, resulted in a

11   fundamentally unfair sentence being imposed in his case in light of the nature of his convictions.

12   <u>Christian</u>, 41 F.3d at 469; <u>Cartwright</u>, 2014 WL 6965649, at *16.

13        Accordingly, this federal habeas court must defer to the California Court of Appeal's

14   determination that the trial court did not commit state law sentencing error in failing to stay

15   petitioner's sentence on the street terrorism charge of which he was convicted.

16   **IV.  Conclusion**

17        For all the reasons set forth above, IT IS HEREBY RECOMMENDED that petitioner's

18   application for a writ of habeas corpus be denied.

19        These findings and recommendations are submitted to the United States District Judge

20   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

21   after being served with these findings and recommendations, any party may file written

22   objections with the court and serve a copy on all parties.  Such a document should be captioned

23   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

24   shall be served and filed within fourteen days after service of the objections.  Failure to file

25   objections within the specified time may waive the right to appeal the District Court's order.

26   <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir.

27   1991).  In his objections petitioner may address whether a certificate of appealability should issue

28   in the event he files an appeal of the judgment in this case.  <u>See</u> Rule 11, Federal Rules Governing

1    Section 2254 Cases (the district court must issue or deny a certificate of appealability when it

2    enters a final order adverse to the applicant).

3    Dated:  January 28, 2015

4

5                                                    _____
                                                     DALE A. DROZD
6                                                    UNITED STATES MAGISTRATE JUDGE

     DAD:8:
7    Thompson32.hc

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28